**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| QUIANA CLARK,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>Defendant. | **Case No.: 2:26-cv-12837**<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br>1. **FCRA, 15 U.S.C. § 1681, *et seq.*** |

Plaintiff Quiana Clark ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*. against Equifax Information Services, LLC ("Equifax" or "Defendant").

## INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

3. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords,

lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

4. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

5. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system *See* 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having her life and character reduced to impersonal "blips" and key-punch holes in a **stolid and unthinking machine which can literally ruin her reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home**. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of her good name without her knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.,* 689 F.2d 72, 79 (6th Cir. 1982) (*quoting* 116 Cong. Rec. 36570 (1970)) (emphasis added).

7. In light of these important findings and purposes, Congress specifically noted "a

need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. 1681(a)(4).

8. Plaintiff's Complaint arises out of Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditors that Plaintiff owed money on tradelines that Plaintiff is no longer legally responsible for.

9. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

10. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## JURISDICTION AND VENUE

11. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

13. Plaintiff is a natural person residing in Westland, Michigan, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14. Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Defendant is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of

furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, Georgia, 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

15. Defendant regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Defendant regularly furnishes consumer reports to third parties for monetary compensation, fees, and other dues, using means and facilities of interstate commerce, and is therefore a "consumer reporting agency" ("CRA") as defined by 15 U.S.C. § 1681a(f) of the FCRA.

16. During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

17. During all times pertinent to this Complaint, Defendant acted through authorized agents, employees, officers, directors, representatives, and/or insurers.

18. Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.

## FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

19. The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

20. The FCRA was designed to protect consumers from the harmful effects of inaccurate

information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. §1681(a).

21. Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *See* 15 U.S.C. § 1681(b).

22. To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. §1681i).

23. The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with either or both of their statutory obligations under the FCRA.

**Defendant's Processing of Credit Information**

24. Defendant, one of the three major CRAs in the United States, regularly publishes and distributes credit information about Plaintiff and other consumers through the sale of consumer reports.

25. Defendant's consumer reports generally contain the following information: (i)

Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

26. Defendant obtains consumer information from various sources. Some consumer information is sent directly to Defendant, and other information must be independently gathered by Defendant, or acquired from third party providers, vendors or repositories, such as computerized reporting services like PACER or Lexis-Nexis.

27. Defendant also obtains information from other CRAs (who commonly share information).

28. Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information on a daily basis with the intention of including it in the consumer reports Defendant sells to third parties for a profit.

29. The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

30. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Defendant) to make lending decisions. Those

institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, date of delinquencies contained in Defendant's reports.

31. The information Defendant includes in consumer reports contributes to a consumer's overall creditworthiness and determines his or her FICO Score.

32. FICO and other third-party algorithms use variables or "attributes" derived from a consumer report to calculate a person's "credit score," which is a direct reflection of his or her creditworthiness.

33. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or her bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

34. Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total

amount of debt reported by Defendant in its consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

35. A consumer's income, however, is not included in his or her consumer report; only his or her amount of debt is.

36. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

37. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

38. A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account was accurately reporting as having a zero-dollar balance.

39. Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is that all statutorily dischargeable debts, other than those that have been reaffirmed or successfully challenged in an adversary proceeding court, are discharged; both such exceptions are rare and furthermore identified on the individual consumer's bankruptcy docket sheet.

40. Additionally, in or around 2009, Defendant implemented its own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

41. The *White* settlement makes clear that the CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d at 769).

42. Defendant's bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

43. In other words, Defendant's automated bankruptcy scrub assumes Defendant's notice of a Chapter 7 discharge is in fact notice that a consumer's pre- petition accounts may be reporting inaccurately, and Defendant will overwrite data reported by a furnisher according to its assumptions and algorithms.

44. However, Defendant has intentionally chosen to disregard knowingly inaccurate open balance and payment obligations of certain types of pre-bankruptcy accounts in Defendant's software programming of its automated "bankruptcy scrub" that it has been employing for well over a decade.

45. Defendant also knows that it is rare for a pre-petition debt to be reaffirmed or successfully challenged in an adversary proceeding.

46. Further, Defendant knows that if reaffirmation agreements or adversary proceedings exist, they will be explicitly identified on an individual consumer's bankruptcy docket, as is required by bankruptcy law.

47. Additionally, information indicating that a specific debt has not been discharged, but instead was reaffirmed or successfully challenged through an adversary proceeding, is retrieved from the same sources from which Defendant independently obtains consumer bankruptcy case information.

48. Defendant also receives information about account reaffirmations or other discharge exceptions directly from furnishers of account/tradeline information.

49. However, Defendant regularly reports inaccurate information about consumers

who have received a Discharge Order.

50. Rather than follow reasonable procedures to assure maximum possible accuracy, as required by the FCRA, Defendant frequently reports information regarding pre-bankruptcy debts based on incomplete or knowingly inaccurate information.

51. Defendant regularly publishes consumer information that conflicts with information: provided by data furnishers to Defendant, already included in Defendant's credit files, contained in public records that Defendant regularly accesses, and/or sourced through Defendant's independent and voluntary efforts.

52. Defendant's unreasonable policies and procedures cause it to routinely report inaccurate and materially misleading information about consumers, including Plaintiff, who have been discharged from Chapter 7 Bankruptcy.

53. Defendant routinely reports inaccurate, and materially misleading information about consumers like Plaintiff, without verifying or updating the information as required by § 1681e(b), despite possessing information inconsistent with the reported information that establishes the reported information is inaccurate.

54. Defendant's unreasonable policies and procedures cause it to regularly report consumer information without verifying its accuracy.

55. Defendant's unreasonable policies, procedures and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681e(b).

56. Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in Defendant's own files.

57. Consumers have filed thousands of lawsuits and FTC and Consumer Financial

Protection Bureau complaints against Defendant for its inaccurate credit reporting following a Chapter 7 discharge.

58. Thus, Defendant is on continued notice of its inadequate post- bankruptcy reporting procedures, which cause Defendant to report inaccurate balances, account statuses, payment histories, and/or payment statuses.

**Allegations Specific to the Credit Reporting of Plaintiff**

59. Plaintiff filed a "no asset" Chapter 7 Bankruptcy on or about February 11, 2026, in the United States Bankruptcy Court for the Eastern District of Michigan (Case No. 26-41418-mlo).

60. Plaintiff received an Order of Discharge on or about May 11, 2026.

61. Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

62. Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

63. The allegations in this Complaint against Defendant are based on consumer disclosures obtained by Plaintiff beginning on June 26, 2026.

64. Defendant reported Plaintiff's credit history in individual "tradelines," including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the dates of the last status update.

65. However, Defendant failed to report Plaintiff's consumer bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

66. Defendant is aware that CRAs are generally required to report accounts included in

a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

67. Defendant should have reported **all** of Plaintiff's dischargeable, pre- petition debts as included in or discharged in Chapter 7 Bankruptcy, and/or with a zero-dollar balance, but did not.

68. Instead, Defendant reported at least one account with an inaccurate account status, payment history, and/or outstanding balance.

**Inaccuracies in Plaintiff's Consumer Report**

69. On or about June 26, 2026, Plaintiff obtained a copy of her Equifax credit report.

70. Upon review of her credit report, Plaintiff observed several inaccuracies.

71. As a preliminary matter, Defendant did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

72. The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on her Equifax consumer report.

73. Defendant failed to report Plaintiff's bankruptcy discharge even though Defendant had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

74. Notably, non-parties Experian and Trans Union accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

75. Defendant knew or should have known that Plaintiff's bankruptcy was discharged.

76. On Plaintiff's consumer disclosure, Equifax inaccurately reported Plaintiff's Lead

Bank account, beginning with 7597********* and opened in September 2020 (the "Lead Account"), which pre-dated Plaintiff's bankruptcy filing.

77. The Lead Account was discharged on or about May 11, 2026.

Therefore, the Lead Account should have been reported as discharged in bankruptcy and with a zero-dollar balance.

78. However, Equifax inaccurately reported the Lead Account with a status of “Charge Off,” and with a balance of $191, instead of a zero-dollar balance.

79. Additionally, Equifax inaccurately reported Plaintiff’s First National Bank account, beginning with 4239************** and opened in October 2022 (the “First National Account”), which pre-dated Plaintiff’s bankruptcy filing.

80. The First National Account was discharged on or about May 11, 2026.

Therefore, the First National Account should have been reported as discharged in bankruptcy.

81. However, Equifax inaccurately reported the First National Account with a status of “Charge Off.”

82. Additionally, Equifax inaccurately reported Plaintiff’s The Bank of Missouri account, beginning with 5166************** and opened in January 2023 (the “TBOM Account”), which pre-dated Plaintiff’s bankruptcy filing.

83. The TBOM Account was discharged on or about May 11, 2026.

Therefore, the TBOM Account should have been reported as discharged in bankruptcy.

84. However, Equifax inaccurately reported the TBOM Account with a status of “Charge Off.”

85. Additionally, Equifax inaccurately reported Plaintiff’s Pinnacle Bank account,

beginning with 5264************** and opened in January 2023 (the "Pinnacle Account"), which pre-dated Plaintiff's bankruptcy filing.

86. The Pinnacle Account was discharged on or about May 11, 2026. Therefore, the Pinnacle Account should have been reported as discharged in bankruptcy.

87. However, Equifax inaccurately reported the Pinnacle Account with a status of "Charge Off."

88. Additionally, Equifax inaccurately reported Plaintiff's Huntington National Bank account, beginning with 5853************** and opened in May 2021 (the "Huntington Account"), which pre-dated Plaintiff's bankruptcy filing.

89. The Huntington Account was discharged on or about May 11, 2026. Therefore, the Huntington Account should have been reported as discharged in bankruptcy.

90. However, Equifax inaccurately reported the Huntington Account with a status of "Charge Off."

91. The Lead Account, First National Account, TBOM Account, Pinnacle Account and Huntington Account (collectively, the "Accounts"), were pre-bankruptcy debts that should have been reported as included in/discharged by bankruptcy *and* with zero-dollar balances

92. The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "Charge-Off."

93. The national consumer reporting agencies specifically acknowledge that a "Charge-Off" generally means consumers are still legally responsible for paying the debt.

94. According to Equifax, a charge-off means the lender has written the account off

as a loss and the account is closed to future charges, the time frame is generally between 120 and 180 days after the consumer became delinquent, and a charge-off does not mean that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

95. Equifax inaccurately reported the Accounts as "Charge Offs" and without any indication that the Accounts were discharged in bankruptcy.

96. Additionally, Equifax inaccurately reported the Lead Account with a balance, instead of a zero-dollar balance.

**Defendant's Unreasonable Procedures**

97. Upon information and belief, Equifax received information from Lead Bank, First National Bank, The Bank of Missouri, Huntington National Bank and/or Pinnacle Bank (collectively, the "Furnishers") indicating that Plaintiff's debts had been included in or discharged through bankruptcy, and/or that the accounts had zero-dollar balances following the bankruptcy discharge. Nevertheless, Equifax rejected or otherwise overrode this information.

98. Alternatively, Equifax knew from past experience that the Furnishers have furnished inaccurate information regarding discharged debts, or have historically failed to implement reasonable procedures to ensure consumer debts are properly updated after a Chapter 7 bankruptcy.

99. Additionally, upon information and belief, Lexis-Nexis also furnished information to Equifax that indicated Plaintiff had filed for bankruptcy and received a discharge, but Equifax rejected or otherwise failed to report the data it received.

100. Furthermore, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Equifax through multiple sources such as PACER, but Equifax failed to review those sources or knowingly rejected them.

101. Thus, Equifax blindly relied on the information provided by the Furnishers without verifying this information against readily available public records showing Plaintiff's bankruptcy and discharge.

102. Therefore, Equifax's reliance on the Furnishers was unreasonable.

103. Equifax inaccurately reported account statuses and/or payment histories.

104. Additionally, Equifax reported that Plaintiff owed balances that Plaintiff did not actually owe.

105. Defendant's reporting of the aforementioned accounts is patently false/incorrect and therefore inaccurate.

106. If not patently false/incorrect, Defendant's reporting of the aforementioned accounts is materially misleading and therefore inaccurate.

**Plaintiff's Damages as a Result of Defendant's Report**

107. Upon information and belief, had Defendant accurately reported the Accounts with zero-dollar balances, Plaintiff's credit scores and/or DTI would have been better.

108. Defendant's reporting of debt that Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

109. The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post- discharge consumers even more than those who have not filed bankruptcy.

110. On June 26, 2026, due to its inaccurate reporting, Defendant was reporting a significantly lower credit score for Plaintiff than the other national CRAs. Specifically, while Trans Union gave Plaintiff a credit score of 644, and Experian gave Plaintiff a similar score of 653, Equifax's credit score for Plaintiff was a mere 618.

111. After Plaintiff's bankruptcy discharge, in or around June 2026, Plaintiff applied for credit with Capital One, and was approved, but at worse overall terms than Plaintiff otherwise would have qualified for due to Defendant’s inaccurate reporting. Plaintiff recently had her hours reduced at work, so the lower credit limit she received was particularly harmful, as she was in need of funds to stay on top of her household’s living expenses.

112. Defendant's inaccurate reporting of the Accounts, along with additional information belonging to Plaintiff, was published to potential creditors by Defendant during the process of Plaintiff's credit application.

113. As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm.

114. As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred for a necessary review of Plaintiff's credit reports.

115. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, humiliation, stress, anger, frustration, shock, embarrassment, violation of Plaintiff's right to privacy, and anxiety.

**CLAIM FOR RELIEF**
**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

116. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

117. The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

118. Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to

use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after the consumer, Plaintiff, received a Discharge Order.

119. Defendant knows or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendant knows or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

120. These obligations are well established by the plain language of the FCRA, as promulgated by the Federal Trade Commission, detailed in case law, and evidenced in prior cases involving Defendant from which Defendant is on notice of its unreasonable procedures concerning the reporting of discharged debts.

121. Additionally, Defendant possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

122. Despite knowledge of these legal obligations, Defendant willfully and consciously breached its known duties and deprived Plaintiff of her rights under the FCRA.

123. Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

124. In this case, Defendant regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer report it sells to other parties for a profit.

125. Defendant received notice of Plaintiff's bankruptcy and discharge through public

records, independent collection of consumer information directly obtained by Defendant through sources of consumer information such as Lexis-Nexis, Defendant's own files, and information provided by data furnishers, yet Defendant rejected the information.

126. Specifically, Defendant knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

127. When Defendant received notice of Plaintiff's bankruptcy information, it had an obligation to ensure it reported Plaintiff's discharge and its effects with maximal accuracy.

128. Defendant received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers, yet Defendant failed to report Plaintiff's bankruptcy information.

129. As a result, Defendant failed to report Plaintiff's bankruptcy information, and reported the Accounts with statuses other than "discharged in bankruptcy."

130. Additionally, Equifax inaccurately reported the Lead Account, which pre-dated Plaintiff's bankruptcy, with a balance instead of a zero-dollar balance.

131. Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

132. Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

133. Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

134. Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

135. Plaintiff also suffers interference with daily activities caused by other harm

including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

136. Defendant is a direct and proximate cause of Plaintiff's damages.

137. Defendant is a substantial factor in Plaintiff's damages.

138. Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq.*

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

ii. An award of actual, statutory, and punitive damages as provided by the FCRA;

iii. Awarding costs and reasonable attorneys' fees pursuant to FCRA 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

iv. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED on August 12, 2026.

*/s/ Landon Maxwell*
Landon T. Maxwell, AZ #038439
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1975
F: (480) 613-7733
E: lmaxwell@consumerjustice.com

Sukayna Almusawi, MI #P89466
CONSUMER JUSTICE LAW FIRM PLC
835 Mason St., Suite C349
Dearborn, MI 48124
E: salmusawi@consumerjustice.com
T: (313) 887-8539
F: (480) 613-7733

*Attorneys for Plaintiff*
*Quiana Clark*